UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
HOWARD HENDERSON,

                  Plaintiff,

     -against-

THE CITY OF NEW YORK; POLICE
DEPARTMENT OF THE CITY OF NEW
YORK; RAYMOND W. KELLY, Commissioner
of Police; GEORGE A. GRASSO, First Deputy
Commissioner of Police; NELDRA M.
ZEIGLER, Deputy Commissioner, Office of
Equal Employment Opportunity; CHARLES V.
CAMPISI, Chief, Internal Affairs Bureau;
RAYMOND F. KING, Deputy Chief, Internal
Affairs Bureau; JAMES DUFFY, Deputy
Inspector, Field Services Division; GEORGE D.
O'BRIEN, Captain, Internal Affairs Bureau
Group 27; BRESTER CREECH, Lieutenant,
Internal Affairs Bureau Group 27; RICHARD
M. LEDDA, Lieutenant, Internal Affairs
Bureau Group 27; LES CATALANO, Sergeant,
Internal Affairs Bureau Group; JOHN A.
EGAN, Retired Sergeant, Southeast Queens
Initiative, each individual defendant being
sued individually and in his or her official
capacity,

                  Defendants.

------------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 05-CV-2588

*Appearances*:
*For the Plaintiff*:
RICHARD L. GIAMPA, ESQ.
ZACHARY GIAMPA, ESQ.
860 Grand Concourse, Suite 1H
Bronx, New York 10451

*For the Defendants*:
MICHAEL A. CARDOZO, ESQ.
Corporation Counsel of the City of New York
By:   ANDREZ CARBERRY, ESQ.
       DANIEL GOMEZ-SANCHEZ, ESQ.
       100 Church Street
       New York, New York 10007

**BLOCK, Senior District Judge:**

Howard Henderson, who is black, is a former probationary officer with the New York City Police Department ("NYPD"). Claiming that he was the victim of unlawful race discrimination and retaliation, he sues the City of New York ("the City") and a number of NYPD officials.[1] His complaint is brought under Title VII of the Civil Rights Act of 1964; 42 U.S.C. §§ 1981, 1983, 1985(3) and 1986; the New York State Human Rights Law ("NYSHRL"); and the New York City Human Rights Law ("NYCHRL"). He also brings claims for intentional infliction of emotional distress and interference with contract under New York common law.

All defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed below, defendants' motion is granted in part and denied in part.

# I

Unless otherwise noted, the following facts are undisputed or, if disputed, presented in the light most favorable to Henderson. *See Federal Ins. Co. v. American Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

---

[1] He also sues NYPD. Since, however, NYPD is a non-suable agency of the City, it must be dismissed as a defendant. *See Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007).

## A. Employment History

### 1. Benjamin Investigation

In November 2000, Sergeant John Egan reported to the NYPD's Internal Affairs Bureau that Henderson's voice had been heard in monitored phone conversations. The monitored phone belonged to Antonio "Frank" Benjamin, whom Egan believed to be the head of the "Third World Crew," a large-scale narcotics operation. According to Egan, Henderson had provided Benjamin with details concerning the arrest of the latter's girlfriend.

In response to Egan's report, Internal Affairs began an investigation that would eventually span more than a year. A few months into the investigation, one of the witnesses against Henderson—NYPD Detective Winston White—was himself charged with conspiring with the Third World Crew to distribute marijuana. White was later convicted and sentenced to 13 years' imprisonment. *See United States v. Wright, et al.*, No. 01-CR-418 (W.D. Tex. Judgment dated Feb. 2, 2002).

Shortly after White's conviction, Henderson was placed on "modified duty" pending the outcome of the investigation. He was required to turn in his badge and firearm, and was reassigned to the Quartermaster Section, where he performed janitorial duties. On April 9, 2002, he was served with written "charges and specifications" accusing him of (1) "provid[ing] department confidential information to a known narcotic dealer," and (2) "associat[ing] with known narcotic dealers." Decl. of Andrez Carberry, Ex. I. He was given a 30-day suspension, effective immediately. The NYPD apparently did not

consider the suspension as ending the matter because Henderson was not removed from modified duty after serving the suspension.

## 2. Adjudication of Charges

In April 2003, Henderson—a reserve member of the armed services—reported for active duty in Iraq. He served there until May 2004, and returned to the NYPD that September. He received full pay during his tour.

When Henderson came back from Iraq, he returned to modified duty pending a department-level hearing on the charges against him. That hearing took place on March 2, 2005, before Deputy Commissioner John Grappone. On June 15, 2005, Grappone issued a memorandum recommending that Henderson be found not guilty on the grounds (1) that there was no evidence that Benjamin was a drug dealer, and (2) that there was no evidence that Henderson provided Benjamin with any information beyond the circumstances of his girlfriend's arrest, information that was regularly provided to members of the public upon request. The recommendation was approved by NYPD Commissioner Raymond Kelly on July 18, 2005. In addition to dismissing the charges against Henderson, Kelley ordered that the 30 days lost as a result of the suspension be restored to him.

## 3. Domestic Dispute

Two weeks before the charges against him were dismissed, Henderson called 911 during a domestic dispute with his common-law wife. The responding officer stated that "there was no misconduct noted on the part of Officer Henderson and no change of duty status was required." Carberry Decl., Ex. CCC. Nevertheless, the incident had to be

reported to Internal Affairs. On November 30, 2005, the investigating officers issued their report. They found no evidence of misconduct and closed their file.

### 4. Alcohol Rehabilitation and Retirement

Henderson was restored to full duty on May 4, 2006, and reassigned to the 106th Precinct. Two days later, he was again stripped of his badge and firearm and ordered to attend a 30-day alcohol rehabilitation camp in upstate New York, or risk facing additional charges. Henderson attests that there was no reason for the order, and the defendants have not offered one. Rather than attend the camp, Henderson tendered his resignation effective July 22, 2006.

## B. Lawsuits and Complaints of Discrimination

### 1. Class Action

When Henderson returned from Iraq in 2004, he learned of a class-action discrimination lawsuit against the City based on the NYPD's disciplinary practices. *See Latino Officer Ass'n v. City of New York*, No. 99-CV-9568 (S.D.N.Y). The plaintiffs in the class action were black and Hispanic officers, and alleged that they had been subjected to more frequent and harsher discipline than their white colleagues. Henderson joined the class action on July 8, 2004. In his claim forms, he asserted that his former precinct (the 113th) was made up of about 90% white officers and about 10% minority officers. He then detailed several instances he claimed constituted race discrimination, including the Internal Affairs investigation into his relationship with Benjamin.

At some point, Henderson sought to opt out of the class action. On January 11, 2005, he was informed that he could no longer opt out without court approval, which

he did not seek.  On April 28, 2005, the City submitted lengthy objections to Henderson's

claims.  The parties were, however, able to work out their differences.  On December 5,

2005, the City paid Henderson $54,000 in exchange for a release absolving the City and its

employees from

> any and all liability for claims of employment discrimination
> based on race or national origin, including but not limited to,
> hostile work environment and retaliation, I have or may have
> arising from my employment with the New York City Police
> Department between September 9, 1996 and December 31,
> 2003, inclusive.

Carberry Decl., Ex. Y.

## 2. *Internal Discrimination Complaint*

On January 10, 2005, roughly a year before the settlement, Henderson filed

an internal discrimination complaint with the NYPD's Office of Equal Employment

Opportunity ("OEEO").  He reiterated the complaints raised in his class-action claim forms,

including the investigation into his relationship with Benjamin.  In particular, he alleged

that the NYPD had failed to inform him of White's conviction and, despite that conviction,

refused to drop the charges against him.

An OEEO officer responded to Henderson's complaint on February 17, 2005.

The officer informed him that Patrol Guide 205-36 prevented OEEO from investigating his

complaint until the charges against him had been resolved.  The cited section provides that

> When charges and specifications are pending against a
> member of the service, an allegation of discriminatory
> treatment raised as a defense to the charges by the respondent
> member of the service shall vest in the exclusive jurisdiction of
> the Deputy Commissioner [of] Trials until the charges and
> specifications have been resolved.  After the charges and

specifications have been resolved, jurisdiction over the allegation of discrimination shall be assumed by the Deputy Commissioner [of] Equal Employment Opportunity.[2]

### 3. EEOC Charge and the Present Lawsuit

On February 2, 2005, Henderson filed a charge of discrimination with the federal Equal Employment Opportunity Commission ("EEOC"). He alleged discrimination based on race and color, as well as hostile work environment and retaliation. For the third time, he set forth his list of grievances. At the conclusion of his list, he noted that his trial regarding the Benjamin investigation was scheduled to begin on March 2, 2005.

The EEOC closed its investigation on February 22, 2005. In a letter of that date to Henderson's counsel, the investigator concluded that "there is insufficient information to support your allegations" and, in addition, that "[m]any of the allegations raised well exceed the 300 day filing period." Carberry Decl., Ex. FFF. A right-to-sue letter was enclosed.

Henderson timely filed suit in this court on May 27, 2005—a little more than five months before executing the December 2005 release. *See* 42 U.S.C. § 2000e-5(f)(1) (civil action must be filed within 90 days of receiving right-to-sue letter).[3] He now claims that, notwithstanding the release, the following actions constitute actionable race discrimination,

---

[2]The Patrol Guide is not part of the record, but the Court takes judicial notice of the version that is available online. *See* http://www.reentry.net/ny/library/ item.178845-NYPD_Patrol_Guide_2005_NYPD (last visited July 14, 2011).

[3]Henderson alleged that he received the right-to-sue letter on March 2, 2005. Defendants do not dispute that allegation. Thus, suit was filed on the 86th day after receipt of the right-to-sue letter.

a racially hostile work environment and/or retaliation:

(1)     the September 2004 decision to leave him on modified duty following his return from Iraq;

(2)     the refusal to address his January 2005 internal discrimination complaint due to the pending charges;

(3)     the July 2005 decision to investigate his domestic dispute despite the responding officer's report of no misconduct;

(4)     the failure to remove him from modified duty until May 4, 2006;

(5)     the May 6, 2006 order to report to alcohol rehabilitation camp; and

(6)     his June 2006 retirement, which he argues constituted a constructive discharge.

## II

Defendants raise several threshold defenses to Henderson's claims, including release and waiver, *res judicata* and the applicable statutes of limitations. Because, however, none of those defenses would bar all of plaintiff's claims, it is more efficient to first address their alternative arguments that Henderson cannot establish a *prima facie* case of discrimination, hostile environment or retaliation. The Court addresses those arguments in turn.

## B. Discrimination

Henderson frames his discrimination claims as both pattern-or-practice claims and claims that he was individually treated differently based on his race.

### 1. Pattern-or-Practice Claims

"[P]attern-or-practice disparate treatment claims focus on allegations of widespread acts of intentional discrimination against individuals." *Robinson v. Metro-North*

*Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001). As such, they are typically brought as class actions. *See id.*

Every circuit court to have considered the issue has held that individual plaintiffs *cannot* bring pattern-or-practice claims. *See Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955, 969 (11th Cir. 2008); *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004); *Celestine v. Petroleos de Venezuella S.A.*, 266 F.3d 343, 356 (5th Cir. 2001); *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 759 (4th Cir. 1998). While the Second Circuit has not yet joined that chorus, it has recognized that a pattern-or-practice class action, if successful at the liability stage, "substantially lessen[s] each class member's evidentiary burden relative to that which would be required if the employee were proceeding separately with an individual disparate treatment claim," *Robinson*, 267 F.3d at 159:

> Should the plaintiffs prove a pattern or practice of discrimination [at the liability stage], the court may proceed to fashion class-wide injunctive relief.
>
> If individual relief such as back pay, front pay, or compensatory recovery is sought in addition to class-wide injunctive relief, the court must conduct the "remedial" phase. Class members enter this second phase with a presumption in their favor that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy.
>
> * * *
>
> [Thus, r]ather than having to make out a prima facie case of discrimination and prove that the employer's asserted business justification is merely a pretext for discrimination, a class member at the remedial stage of a pattern-or-practice claim need only show that he or she suffered an adverse employment decision and therefore was a potential victim of the proved class-wide discrimination. The burden of

> persuasion then shifts to the employer to demonstrate that the
> individual was subjected to the adverse employment decision
> for lawful reasons.

*Id.* at 159-60 (citations, internal quotation marks and alterations omitted). In other words,

allowing individual plaintiffs to assert pattern-or-practice claims effectively allows them

to avoid the otherwise-applicable burden of showing a connection between an adverse

employment action and discriminatory animus. This shift in the burden of proof persuades

the Court that the holdings of the Fourth, Fifth, Sixth and Eleventh Circuits are correct.

*Accord United States v. City of N.Y.*, 631 F. Supp. 2d 419, 425 (S.D.N.Y. 2009) (collecting

cases). Accordingly, Henderson's claims must be construed solely as individual claims of

disparate treatment.

### 2. Individual Claims

Henderson's individual claims are analyzed under the familiar burden-

shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Second

Circuit recently described that framework as follows:

> [T]he plaintiff bears the initial burden of establishing a prima
> facie case of discrimination. . . . If the plaintiff does so, the
> burden shifts to the defendant to articulate some legitimate,
> non-discriminatory reason for its action . . . . If such a reason is
> provided, plaintiff may no longer rely on the presumption
> raised by the prima facie case, but may still prevail by
> showing, without the benefit of the presumption, that the
> employer's determination was in fact the result of . . .
> discrimination.

*Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008) (citations and internal quotation

marks omitted). To make out a prima facie case of disparate treatment, the plaintiff must

show (1) that he belonged to a protected class; (2) that he was qualified for the position; (3)

that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). Henderson's ability to state a prima facie case turns—as it does in so many cases—on the fourth element.[4]

Henderson's attempt to raise an inference of discrimination focuses on three things: (1) the class action lawsuit and the allegations made therein, (2) statistics regarding relative discipline rates in the 113th Precinct in 1999 and 2001, and (3) the disciplinary record of Officer Jeanine O'Mally of the 61st Precinct, whose alleged involvement in an insurance fraud scam was investigated and resolved in less than a week.[5] Whether taken separately or collectively, this evidence is insufficient to make out the fourth element of a prima facie case of disparate treatment.[6]

---

[4]Defendants also challenge Henderson's ability to show that he suffered an adverse employment action. The Court is satisfied, however, that at least his placement on modified duty qualifies. *See, e.g., Bazile v. City of N.Y.*, 215 F. Supp. 2d 354, 378 (S.D.N.Y. 2002) (reassignment that significantly altered job duties was "at least arguably an adverse employment action"). Henderson's retirement would also qualify if it was truly involuntary and, therefore, a constructive discharge.

[5]Henderson has also submitted several newspaper articles reporting allegations of discrimination within the 113th precinct. These are, of course, inadmissible hearsay. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

[6]Although the dates of O'Mally's disciplinary proceedings are not reflected in the record, it is clear that both the class action allegations and the statistical evidence reflect conditions prior to December 2003. Defendants argue that the release bars the Court from considering those matters.

The release undoubtedly bars consideration of any *claim* arising out of Henderson's employment prior to December 2003. But since all of Henderson's claims involved actions taken after December 31, 2003, none wholly "arose" out of his employment prior to that date.

With respect to the class action, allegations unsupported by any evidence are insufficient to defeat summary judgment. *See Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir. 1999) ("[T]he non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." (citation and internal quotation marks omitted). In any event, "[t]he mere fact of other lawsuits against the City does not provide a basis for liability." *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 311-12 (S.D.N.Y. 1998).

With respect to statistics, Henderson relies on discipline logs produced by the NYPD. Those logs show that minority officers received approximately 33% of the command disciplines issued by the 113th Precinct in 1999, and about 59% of the command disciplines issued by the precinct in 2001. If Henderson is correct that minorities made up only 10% of the princincts' officers,[7] the logs tend to show that a disproportionate number of command disciplines were issued to minority officers.

If this were a pattern-or-practice case, those statistics might well be sufficient to make out a prima facie case of liability. *See Robinson*, 267 F.3d at 158 ("Statistics alone can make out a prima facie case of discrimination if the statistics reveal a gross disparity

---

Whether the release bars consideration of pre-December 2003 *evidence* is a closer question. In a closely analogous context, the Supreme Court has held that a statute of limitations does not "bar an employee from using prior acts as background evidence in support of a timely claim." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). There is arguably, however, a line to be drawn between "background evidence" and evidence bearing on an entire element of the plaintiff's prima facie case. For purposes of this motion, the Court can avoid deciding where that line should be drawn by assuming *arguendo* that it may consider all evidence in the record.

[7]He does not offer any basis for his estimate.

in the treatment of workers based on race." (citation, internal quotation marks and alteration omitted)). But, as the Court has previously observed, "[s]tatistics alone are insufficient in a disparate-treatment claim because an individual plaintiff must prove that he or she in *particular* has been discriminated against." *Drake v. Delta Air Lines, Inc.*, 2005 WL 1743816, at *6 (E.D.N.Y. July 21, 2005) (emphasis added) (citing *Hudson v. Int'l Machines Business Corp.*, 620 F.2d 351, 355 (2d Cir. 1980)).

This case perfectly illustrates why more than statistics are needed to raise an inference that a particular individual was a victim of discrimination. Henderson's statistics relate to discipline in the 113th Precinct. The charges against him, however, were prosecuted by the NYPD's Advocate's Office. His internal discrimination complaint was handled by OEEO. His domestic dispute was reported by the commanding officers of the 103rd Precinct and investigated by the Internal Affairs Bureau. The process for restoring him to regular duty was set in motion by a "Suspended/Modified Review Board," whose recommendation was endorsed by the First Deputy Commissioner and approved by Commissioner Kelly. The decision to order him to alcohol rehabilitation was made by a sergeant at the Early Intervention Unit. Possible discrimination at the 113th Precinct sheds absolutely no light on the motivation of these individuals.

Finally, with respect to Officer O'Mally, the Court cannot make any meaningful comparisons because Henderson has not offered any evidence that she and he were "similarly situated in all material respects." *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997). Since the Court knows nothing about the circumstances of O'Mally's disciplinary proceedings, it cannot conclude that the NYPD treated Henderson "less

favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

Henderson's inability to make out the fourth element of a prima facie case is fatal to his Title VII disparate treatment claim. Because the standards of liability are the same, it is also fatal to his § 1983 claim based on the Equal Protection Clause, *see Ruiz v. County of Rockland,* 609 F.3d 486, 491 (2d Cir. 2010), his claims under § 1981, *see Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010), and his claims under the NYSHRL and NYCHRL, *see Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir.2010).

## B. Hostile Work Environment

"[T]o survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 84 (2d Cir. 2010) (internal quotation marks and citation omitted). The dispositive principle here is that the hostility must be "discriminatory" -- that is, based on race (or some other unlawful factor). Since, as discussed above, Henderson has failed to offer sufficient evidence of discriminatory animus, his hostile environment claim must also fail.

## C. Retaliation

Retaliation claims are also analyzed under the *McDonnell Douglas* framework; the only difference is the elements of the prima facie case. *See Kaytor v. Electric Boat Co.*, 609 F.3d 537, 552-53 (2d Cir. 2010).

*1. Prima Facie Case*

To establish a prima facie case of retaliation, Henderson must show (1) that he participated in a protected activity known to the NYPD, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between his engaging in the protected activity and the adverse employment action. *See Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006).

It is undisputed Henderson engaged in the following protected activity known to the NYPD: (1) joining the class action in June 2004, (2) filing an internal discrimination complaint with OEEO in January 2005, and (3) filing a charge of discrimination with the EEOC in February 2005.

With respect to the second element, the definition of "adverse employment action" is more relaxed in the retaliation context. The plaintiff need only show that the challenged action was "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks v. Baines*, 593 F.3d 159, 162 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006)).

It is doubtful that an internal investigation, standing alone, would dissuade a reasonable worker from engaging in protected activity. Here, however, the investigation was the ostensible reason for keeping Henderson on modified duty. Similarly, the order to report to alcohol rehabilitation camp was accompanied with a threat of further charges if Henderson did not comply. The Court concludes that both the investigation into Henderson's domestic dispute and the order that he attend alcohol rehabilitation camp carried a sufficiently severe consequence—prolongation (or threatened prolongation) of

his stint on modified duty—to qualify as an adverse employment action in the context of retaliation. As with the disparate treatment claims, Henderson's retirement would also qualify if it rose to the level of a constructive discharge.

By contrast, the decision not to dismiss the charges and to return Henderson to full duty when he returned from Iraq could not have deterred Henderson because it imposed no negative consequences beyond those he faced before his departure. The Court further concludes that the refusal to investigate the internal discrimination complaint until the charges were resolved would not have discouraged a reasonable person from pursuing the complaint.

As for the third element, "a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110-11 (2d Cir. 2010). "Though [the Second Circuit] has not drawn a bright line defining . . . the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship." *Id*. at 110. In other circumstances, three months may be too long. *See, e.g., Hollander v. American Cyanamid Co.*, 895 F.3d 80, 85-86 (2d Cir. 1990).

On the facts of this case, the Court cannot say, as a matter of law, that the five to six months that elapsed between the filing of Henderson's internal and EEOC complaints in January and February 2005, and the investigation of his domestic dispute—and concomitant extension of his placement on modified duty—in July 2005, cannot give rise to an inference of retaliation. If, as Henderson contends, defendants used

modified duty to punish him for filing his complaints, there was no need for a reason to extend his placement until it became apparent in June 2005 that the charges justifying it would be resolved in his favor. At that point, the domestic dispute may simply have been the first pretext to present itself.

In all other respects, however, the temporal proximity is not close enough to give rise to an inference of retaliation. No adverse employment action closely followed Henderson's decision to join the class action, while the order to attend alcohol rehabilitation and Henderson's subsequent retirement came well over a year after his last protected activity.

## 2. Legitimate, Non-retaliatory Reason and Pretext.

Defendants submit that keeping Henderson on modified duty past July 2005 was necessitated by the investigation into his domestic dispute. That explanation may well be true, but there are sufficient issues to create an issue of fact as to pretext. First, one could question the legitimacy of the investigation in light of the reporting officer's conclusion that Henderson was not guilty of any misconduct. Second, the investigation ended in November of 2005 and, therefore, cannot explain why Henderson was left on modified duty until May of 2006. Because of these issues, a jury will have to determine whether the decision to keep Henderson on modified duty past July 18, 2005, was motivated by retaliatory animus or legitimate, nonretaliatory concerns.

Retaliation is actionable under Title VII, the NYSHRL and the NYCHRL. It is also actionable under § 1981. *See Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998) ("To be actionable under § 1981, the retaliation must have been in response to the

claimant's assertion of rights that were protected by § 1981."); 42 U.S.C. § 1981(b) (statute protects "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"). Accordingly, the motion for summary judgment is denied as to retaliation claims under those statutes.[8]

## D. Remaining Claims

It remains for the Court to address Henderson's remaining claims, which consist of (1) claims under § 1983 based on the Due Process Clause of the Fourteenth Amendment, as well as the First, Fourth, Fifth, Ninth and Thirteenth Amendments; (2) claims under §§ 1985(3) and 1986; and (3) claims under New York common law for intentional infliction of emotional distress and interference with his employment contract.

### 1. § 1983

Henderson has no § 1983 claim under the Due Process Clause of the Fourteenth Amendment because he cannot establish the deprivation of a property or liberty interest. Henderson was a probationary employee, and "[i]t is well settled that a probationary employee, unlike a permanent employee, has no property rights in his position and may be lawfully discharged without a hearing and without any stated specific reason." *Meyers v. City of N.Y.*, 622 N.Y.S.2d 529, 532 (2d Dep't 1995). As for his liberty interest in his reputation, he was entitled to no more than an opportunity to clear his name, an opportunity of which he successfully availed himself.

---

[8]The Second Circuit has not definitely decided whether retaliation is actionable as a § 1983 claim based on the Equal Protection Clause of the Fourteenth Amendment. It is not necessary for the Court to do so here because there is no practical difference between such a claim and a retaliation claim under § 1981. Individual liability and attorney fees under 42 U.S.C. § 1988 are available for both.

The basis for Henderson's First Amendment claim is that he suffered retaliation after being interviewed about discrimination in the 113th Precinct; the interview appeared in a *Newsday* article in February 2005. Henderson raised this claim for the first time in his opposition to defendants' motion for summary judgment. Therefore, the Court will not consider it. *See* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1193 n. 9 (3d ed. 2004) ("An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims."). Similarly, Henderson's Ninth Amendment claim is deemed waived because he has never articulated the basis for it.

Henderson's remaining § 1983 claims are without merit. A Fourth Amendment claim is not possible because Henderson does not claim that he was unreasonably seized or searched. A Fifth Amendment claim is not possible because he is not a federal employee. *See Public Utilities Comm'n v. Pollak*, 343 U.S. 451, 461 (1952) (Fifth Amendment applies only to action of federal government). A Thirteenth Amendment claim is not possible because Henderson does not claim that he was subjected to involuntary servitude.

### 2. §§ 1985(3) and 1986

"The elements of a claim under Section 1985(3) are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, . . . ; (3) an act in furtherance of the conspiracy; (4) whereby a person is . . . deprived of any right of a citizen of the United States." *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 1999) (citation and internal quotation marks omitted). Because the conspiracy must be to deprive someone of equal protection of the laws, the

plaintiff must show that the conspiracy was motivated by discriminatory animus. *See id.* Since Henderson has failed to offer sufficient evidence of such animus, his § 1985(3) claim must fail.

42 U.S.C. § 1986 creates a claim again anyone who, with the power do so, fails to prevent a § 1985(3) conspiracy. It is, therefore, premised on the existence of a valid § 1985(3) claim. *See Brown*, 221 F.3d at 341. Since Henderson does not have a valid § 1985(3) claim, he does not have a valid § 1986 claim.

### 3. State Common Law

New York General Municipal Law §50-e, which requires any person asserting a state-law tort claim against a municipality to file a notice of claim within 90 days of the occurrence underlying such claim. "[I]n a federal court, state notice-of-claim statutes apply to state-law claims." *Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999).

Henderson does not claim to have filed a notice of claim. His state common-law claims are, therefore, barred.

### III

There is a genuine issue of fact as to the motivation to keep Henderson on modified duty past July 18, 2005. It may have been, as defendants argue, a necessary incident to the decision to investigate Henderson's domestic dispute. There is also sufficient evidence, however, to support the inference that that reason was a pretext, and that the real reason was retaliatory animus arising out of Henderson's internal and EEOC complaints of discrimination.

Accordingly, defendants' motion for summary judgment must be denied with respect to Henderson's retaliation claims under Title VII, § 1981 and the NYSHRL and NYCHRL. In all other respects, the motion is granted.[9]

**SO ORDERED.**

s/
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
July 20, 2011

---

[9]At oral argument, the Court took a more categorical view of Henderson's evidence of discrimination. *See* Tr. of May 19, 2001, at 12 ("Listen to me, I'm not going to do anything that predates [December 31, 2003]. He signed off, he got 50,000, it's a clean slate."). Although, as explained above, the issue required a more finessed analysis, it remains the case that Henderson's devotion to his discrimination claims did nothing more than distract the Court's attention from his viable retaliation claims.